121 A.2d 647 (1956)
STATE
v.
Harold R. KENNEDY.
Ex. No. 9558.
Supreme Court of Rhode Island.
April 5 as of January 17, 1956.
*648 William E. Powers, Atty. Gen., Alfred E. Motta, Special Counsel, Providence, for the State.
Aram A. Arabian, Public Defender, John DiLibero, Asst. Public Defender, Providence, for defendant.
FLYNN, Chief Justice.
This is an indictment charging that the defendant on March 14, 1953 "with force and arms, at Providence in the aforesaid County of Providence did rob one Anna Mainelli." After a trial in the superior court a jury returned a verdict of guilty as charged and thereafter the trial justice denied the defendant's motion for a new trial. The case is here on his bill of exceptions to that decision and to five rulings excluding certain testimony, all other exceptions being expressly waived.
The evidence for the state showed among other facts that on the evening of March 14, 1953 the owners of a house at No. 665 Pleasant Valley Parkway in the city of Providence had left their children and home in the care and custody of Mrs. Anna Mainelli for the evening; and that about nine o'clock on that night a man came to the door and rang the bell. Mrs. Mainelli responded and saw this man outside holding his hat in his hand. He asked her if the man of the house was at home. She opened the door only enough to be heard and replied in the negative. The man, who later was identified as defendant, then pushed her aside, opened the door, and entered the house announcing: "This is a holdup." He then displayed a black gun which had been concealed by his hat. He ordered Mrs. Mainelli into the den where her daughter and the daughter of the owners, both about thirteen years of age, were reading. That room was brightly lighted and defendant ordered them to lie down on the floor.
He then turned the light off and on a couple of times, evidently as a signal to others. Immediately two accomplices, who wore masks made out of paper bags, entered the house and asked where the safe was. When the occupants disclaimed knowledge of any safe, the accomplices began to ransack the house and so continued for about fifteen minutes. During that time the defendant sat in the lighted den thus giving Mrs. *649 Mainelli and the two girls an opportunity to look at him. When the accomplices returned without finding the safe, some remarks were made and all three left the house, but only after they took some money from a pocketbook and other personal property of the value of $150.
The police were notified immediately and began their investigation. As a result thereof Mrs. Mainelli and the two girls were summoned to police headquarters on seven or eight different occasions to see if they could identify certain individuals who were suspected of possibly being involved in this crime. They were unable to identify any of those suspects. However, on April 18, 1953, after defendant was taken into custody for questioning in connection with another reported crime, he was viewed separately and at different times by the two girls and by Mrs. Mainelli. Each of them identified him positively as being the unmasked man who had the gun and guarded them in the den on March 14, 1953 while the two accomplices searched the house and took the valuables.
On the other hand the defendant, insisting throughout that these witnesses were mistaken, took the witness stand and denied that he was present in Providence on March 14, 1953. He presented an alibi in defense and testified that, with the exception of a couple of days when he went to Washington, D.C. on business with the veterans' administration and returned directly to Richmond, Virginia, he was in the latter city at all times between March 12 and about April 14, 1953; that during the entire evening of March 14, 1953 he was actually working at papering and painting rooms in the home of Mr. and Mrs. Claude W. Ledford in the city of Richmond, where he also spent the night; that following some two or three weeks' residence with them in their house after March 14 he left Richmond, since it was difficult to hold any job because of his criminal record; and that he intended and started to go to Chicago where he hoped to find work more easily.
However, he testified that he left with only $2; that in hitch-hiking he received the offer of a sailor to ride from Baltimore to Quonset Point near Providence; that he came to Providence on April 17 for the first time in his life; and that he was arrested on April 18 while he was inquiring as to the location of route 1, intending to return to Washington, D.C.
In his effects he carried notations of two addresses, one of which concerned a well-known criminal. In explaining these he testified that the address of one was the wife of a convict with whom he had served in a southern jail, and that she gave him the address of the other as a friend of her husband who might finance defendant's trip back to Richmond, Virginia. Apparently he sought no work in Washington on his journey north and sought none in this state when he arrived. Nor did he explain why he was returning so quickly to Washington or Richmond, both of which he had left a few days previously in order to seek work in Chicago. His only disclosed contacts here concerned persons who had criminal records.
In relation to his defense of an alibi, the court at defendant's request permitted the testimony of four witnesses to be taken by deposition in Richmond, Virginia. These included a social worker in the Richmond Chapter of the American Red Cross where defendant had received some help, the landlady at whose home he had boarded and roomed just prior to going to live at the Ledfords' house, the defendant's married sister, and Mrs. Ledford at whose house he claimed to have spent the entire evening and night of March 14, 1953.
The defendant now argues in general that the cross-examination of himself and his witnesses by the state's attorney tended to create an artificial atmosphere, the effect of which was to prevent the jury from fairly weighing the testimony in his behalf; that in denying defendant's motion for a new trial the trial justice misconceived the evidence, because a review thereof will show that the state failed to prove him guilty beyond a reasonable doubt; and that certain testimony was erroneously excluded as set forth under his exceptions numbered 2, 3, 4, 6 and 7.
*650 In our opinion the transcript does not support any of these contentions. In connection with the first, it was defendant himself who first introduced evidence relating to some of his early history and misfortunes, and also his later criminal record of several convictions in various states for crimes involving bad checks and forgery. He also elected to testify and offered an alibi as his defense. The cross-examination of defendant and his witnesses in this connection was not different from what would ordinarily be expected and permitted in testing the truth of the statements with particular reference to the asserted alibi. The defendant cannot complain of a prejudicial atmosphere merely because of the criminal record he introduced or because the state's attorney did not accept as true every fact which defendant and his witnesses had asserted in their direct testimony.
The defendant also argues that the trial justice in denying the motion for a new trial had misconceived the evidence. However, he does not point out in his brief or argument any specific instance which supports that claim and we have found none. In this connection it is argued that the trial justice's reference to testimony concerning defendant's accent as strengthening the witnesses' identification of him shows a misconception because defendant had a "southern drawl" but not an "accent," and that similarly this confusion should greatly weaken the identification made by the state's witnesses.
In our judgment there is no merit in this contention. The record shows that the trial justice and the witnesses unquestionably made it clear that by using the word "accent" they were describing defendant's characteristic manner of speech. In common parlance a southern "accent" and a southern "drawl," as counsel now describes defendant's speech, are frequently used interchangeably. Both submit to the definition of "accent," namely, a peculiar modulation of the voice in speaking. The defendant admittedly had such a characteristic accent or manner of speaking.
The defendant further contends that the state failed to prove by the evidence that he was guilty beyond a reasonable doubt. In this connection the trial justice specifically and correctly charged the jury as to defendant's presumption of innocence and the necessity for the state to establish his guilt beyond a reasonable doubt. He also instructed the jury on all the essential points of law in a manner that fully protected defendant's legal and constitutional rights. That it was clear, instructive and fair on all these issues is indicated by the fact that no exception was taken to any part thereof.
In the course of his charge the trial justice pointed out that defendant did not question the fact, which was shown by undisputed evidence, that a crime of robbery had been committed by somebody at the time and place alleged in the indictment; that therefore the only issue to be determined was whether defendant was one of the three men who participated therein; and that this issue must be determined by a consideration of all the evidence and in particular the conflicting evidence offered by the three witnesses for the state, who identified him, as against the testimony of defendant and his witnesses so far as it placed him in Richmond, Virginia, during the entire evening and night of March 14, 1953. This was not a case depending solely upon circumstantial evidence or on an identification made hastily or under difficult and questionable conditions. In addition to the opportunity of viewing defendant's features, complexion and other physical characteristics as he sat in the brightly lighted den for a substantial part of fifteen minutes, the state's witnesses had heard him speak in his characteristic manner, which was also apparent at the trial.
In the circumstances, if the testimony concerning the positive identification of defendant by the state's witnesses as the unmasked person at the scene of the crime is believed, there is no question but that the evidence established defendant's guilt beyond a reasonable doubt. The jury, after careful consideration of all the evidence, believed the witnesses for the state and they *651 did not believe that defendant was personally in Richmond on the night of March 14, 1953 as he and certain of his witnesses had testified.
The trial justice in his decision discussed the important evidence, the reason and strength behind the positive identification of defendant, and the weaknesses in his testimony and that of some of his witnesses. He referred to certain conflicts between parts of defendant's testimony and that of his witnesses, particularly Mrs. Ledford. She alone testified to actually seeing defendant in Richmond on the night of March 14, 1953 at her house. It is unnecessary to repeat all that the trial justice discussed in his decision concerning her testimony. Clearly the evidence disclosed her special interest in defendant and a significant conflict between her statement to the police shortly after March 14, that she could not say defendant was at her house on that night, and her deposition taken about a year later when she was positive he was there. It also showed conflicts between certain portions of her testimony and that of defendant and his landlady. From these and other weaknesses in the testimony when viewed as a whole, there was ample ground for the trial justice to agree with the verdict of the jury and to state expressly, as he did, that he did not believe Mrs. Ledford or the defendant in respect to his presence in Richmond on the night of March 14, 1953.
We have reviewed the transcript and the trial justice's decision, and in our opinion it discloses an appreciation of the law requiring him to pass his independent judgment on the evidence when considering the defendant's motion for a new trial. In his decision he performed that duty. In so doing he did not misconceive or overlook any material evidence and he expressly approved the verdict of the jury. Such a decision will not be disturbed unless it is clearly wrong. State v. Badnelley, 32 R.I. 378, 79 A. 834; State v. Di Noi, 59 R.I. 348, 195 A. 497; State v. Prescott, 70 R.I. 403, 40 A.2d 721. In the circumstances of record we find no error in that regard.
The defendant further contends that the trial justice erred in excluding testimony which is considered in the five exceptions previously noted. They relate generally to irrelevant matters and in at least two instances the substance thereof was introduced in other testimony without objection. So far as they indicate anything material, the facts were before the jury. In our opinion these exceptions, neither individually nor together, present any error prejudicial to the defendant and therefore they are overruled. State v. Collins, 24 R.I. 242, 52 A. 990; State v. Arnold, 64 R.I. 355, 12 A.2d 401.
After the case was argued in this court the defendant wrote directly to one of the justices stating that his attorney, the public defender, had failed to comply with his request to summon certain witnesses to testify personally at the trial. In other words he apparently was claiming in effect that defendant thereby was deprived of due process of law.
Ordinarily we do not recognize such a letter from a defendant in a pending case when he is represented, as here, by an attorney. But in the special circumstances we have deemed it advisable to consider this claim as if it were properly before us. However, we do not intend to establish a precedent for similar treatment in future cases. Indeed we do not approve a practice under which a defendant may withhold any defense which was reasonably available to him for presentation at trial and then attempt to raise it before us for the first time on review, although it was not in his bill of exceptions.
As a result of our investigation we have placed in the record certain relevant facts which were offered by the public defender as defendant's attorney in reply to the claims appearing in defendant's letter. It appears from these facts that every witness suggested by defendant was interviewed; that some were either unwilling or unable to testify under oath to any facts helpful to the defense; that defendant was informed promptly and in detail before trial of the results of such interviews; and that he knowingly, understandingly and voluntarily acquiesced in his counsel's judgment that *652 it would certainly not serve the defendant's best interest to summon or take depositions of any witness who would not testify under oath to facts which would be helpful to him. Similarly, with defendant's full knowledge and consent the testimony of every witness who could testify to any fact favorable to the defense was at his request taken by deposition because such witnesses were not able to come to Rhode Island to testify.
Furthermore the transcript shows that at the conclusion of the evidence and before the jury received instructions on the law, the trial justice specifically asked defendant whether there was anything which his counsel may have overlooked or failed to do in accordance with defendant's desire, and also whether there was any further assistance which the court could extend to him. At that time the defendant answered unqualifiedly to the effect that he had received a fair trial from the court; that he was satisfied with his counsel's efforts in his behalf; and that the latter had left nothing undone in presenting the defense as desired by defendant.
It is clear from the record, therefore, that the defendant's present claim is baseless. There is not a scintilla of evidence to support his claim that his attorney failed or refused to obtain the testimony of any available witness suggested by him. It is also clear that the court did not deny him any process or aid which he desired; that the defendant intelligently, understandingly and voluntarily acquiesced in his counsel's conduct of the trial; and that he significantly failed to raise this or any question of due process under the constitution of the United States or of the state of Rhode Island, before, during or immediately after the trial, obviously because he had been accorded by counsel and the court the full protection of the law and due process as prescribed by both constitutions.
All of the defendant's exceptions are overruled, and the case is remitted to the superior court.
CAPOTOSTO and BAKER, JJ., not participating.